v. Maiben and James Yes, that's right, your honor. This is the court, I'm Karen Lantown, I represent Anithiok James. I'll be splitting my time with Mr. Maiben's attorney. Okay. As you know, there's three sentencing issues. I'd like to first address the government's 28J letter, which contends that the case of United States v. Payton controls the question in this case as to whether Yes? You're representing Maiben or James? I'm representing Mr. James, I'm sorry. Okay. Okay. You have to forgive me, my allergies seem to be acting up here. So anyway, I'd like to address the question of whether Payton case controls. The Payton case does not control the outcome of this case for several reasons. First, it's important in considering the question of abuse of trust to distinguish between a breach of trust and abuse of trust. There has to be the position of trust has to be with regard to the victim. And the government has argued that Payton holds that the victim is not necessarily the person that suffers the financial loss. But the Payton case is distinguishable, first, because it's an identity theft case. In identity theft, we know that there are, even if the ultimate financial loss is suffered by the credit card companies or the banks, we know that there are attendant losses to the people whose identity is stolen. The second point is that, and in fact, if you look at the amended, the current version of the guidelines which don't apply to this case, they make clear that the abuse of trust includes persons whose identities are stolen in the context of identity theft. That's the first thing that distinguishes Payton from this case. The second point is that Payton involved a U.S. Postal Service employee. And while the, if you look at the abusive, if you look at the guideline that governs abuse of trust, there's a special provision for U.S. Postal employees to steal mail. Now, this employee did not steal mail. She was the supervisor. And she stole her employee's identities and then used them to get credit cards. But it's important that the Sentencing Commission has adopted an interpretation of abusive trust that obviously considers postal employees perhaps in a somewhat different category. That's not the basis of the Payton decision, but it's an important point to note. In this case, Mr. James, the ultimate victims of the real estate fraud that went on in this case were the investors, Fannie Mae, Bank of America, IndyMac, the large investors that ultimately purchased the loans. Oh, and HUD, of course, in the context of the Title I loans. They suffered the loss. The borrowers did not suffer the loss. There's no evidence to suggest that they, that they suffered any kind of financial loss. So would the initial lenders have been in a position of trust with Mr. James? No, Your Honor. The government argues that they do based on convention and practice, but I think that's mistaken. The initial lenders, there was testimony that they relied on mortgage brokers to bring them accurate information. But reliance alone does not create an abusive trust, a position of trust, rather. There is reliance in every fraud case. And the Fourth Circuit said that very well. In every case, every fraud case, you have some reliance. But isn't there more likely to be more reliance when the person is professionally licensed? In other words, that the initial lender takes this file and they don't send an army of people out to check it all out. They say, no, this guy's licensed, and we'll take it on face value and go from there. Well, he had a real estate license, Your Honor. But, I mean, if you look at it in the context of, for example, okay, first, well, it's important to distinguish that the real estate license itself is a special skill, can't comprise the basis for this adjustment here, because he got the role adjustment as well. So he has to be based on a position of trust. But if you – there are many licensed professionals, like any time an attorney commits a crime, for example, it doesn't mean that there's a position of trust. He has to commit a crime in relation to a client or in relation to somebody who's in a trust – position of trust. But here the lenders, I mean, they said they relied on him because he's licensed. And, you know, they may have relied on him, but he didn't hold the type of position that had the hallmarks of a position of trust. It wasn't a fiduciary relationship. It wasn't an attorney-client relationship. It wasn't a bank executive embezzling from his bank. It wasn't an employer-employee relationship. It was a commercial relationship. I mean, there's no question that Mr. James engaged in fraud, but he didn't have a special position with these initial lenders. How about with the borrowers that he was representing? Well, he – that's – yeah. I mean, definitely if he had stolen – if he had done what that defendant in Akin Coy did in the Fourth Circuit, if he had stolen their personal information and used it to further his own death. But in this case, he had a – let's – so you say as between the borrowers, he did have a position of trust. But he didn't have a position of trust with all of the borrowers, Your Honor. The ones who got home improvement loans. Yes, but my – you know, he was involved in some of them, and he – Well, any of them. I mean, the thing is, I was – Any of them. What did he have a position – Well, the only one he probably – the only one, the case, the evidence was that the one – the people that he dealt with, the primary person he dealt with as far as the borrowers was Pamela Jackson, who did not suffer loss. And so – Well, did he have a position of trust with borrowers and her home improvement loans generally? Or are you saying only with Pamela Jackson? I would say only with her, Your Honor. Why is that? Because he was the one who dealt with her, and a breach of trust has to be based on the defendant's personal conduct, not on vicarious liability. And the other defendant, Mr. Ockpon, was the one who dealt, for example, with the EXPOS and the other – I mean, a lot of these – a lot of these were actually just, you know, phantom borrowers, or they were aliases. But Mr. Ockpon, there was more evidence that Mr. Ockpon had actually had a relationship of trust with, say, the EXPOS and – oh, I can't think of the – there was another legitimate – oh, the Whitmore, McKenna Whitmore. Well, can I just – let me try to make this specific. The PSR in this report cited this, said, James abused the position of trust that existed between him and unsophisticated homebuyers who signed blank documents, as James instructed, and received HUD improvement loans with no understanding of how the funds were to be used, or that they would be required to reimburse the funds, of which James customarily took his cut. Now, why – that's why I'm asking. Do you dispute that there was an abuse of trust in that relationship? Yes, I do. And that he didn't harm them by taking a cut of the proceeds that – First of all, these buyers – yes, I do. They did not suffer any kind of cognizable loss. Again, there was no financial loss to them. There's no evidence in the record that they had – that they suffered adverse – other adverse reactions. If there were evidence in the record, for example, that they had deteriorated credit or that something like that had happened, that would be one thing. But there isn't. Were there legitimate loans? These were – from their standpoint, they thought they were going to get – They thought they were – well, they didn't – I mean, there was – Can I finish my question? I'm sorry. You're going to go off answering questions that I'm not asking. Did they – did they expect to get money out of these home improvement loans? Who – The buyer – the borrowers. Well, yes, and they did get money. And they did get money. They did get money. They didn't get all of it. Is there any evidence – they got – they didn't get all of it. That's right. Okay. Is there any evidence in the record to suggest that if they dealt with somebody who wasn't siphoning off part of the proceeds, that they couldn't have gotten more money? Yes, there is. But, Your Honor, these – most of these buyers would not have qualified for homes in the first instance. That's one of the reasons. You say most. Do we have to find all of them or one or not? I would say – well, certainly all the ones that Mr. James dealt with. What about this borrower Whitmore? Well, Mr. James did not deal with her personally. All of her contacts were with Mr. Ockpon. And as I said, the breach of the abuse of trust adjustment must be based on personal conduct. If there are no further questions, I will reserve a minute for rebuttal and hand it over to my co-counsel. May it please the Court. Wayne Young representing Oliver Maven. First issue is the Rule 404B, 403 issue. It admitted in the direct case, my client didn't testify, that he had a prior perjury conviction. The evidence was certainly unnecessary. They had abundant – the government did – other evidence that Oliver Maven was using the name Roland Lockhart. They had driver's license, checks, all kinds of information. And it was extraordinarily prejudicial to admit that he had a prior felony perjury conviction. You can think of very little more damage to a case than for the jury to know both that he has a felony conviction and that that conviction was for the crime of perjury. So I think as a 403 matter, it meets the test of being extraordinarily prejudicial. The more difficult question is, was he ever harmless, given all the evidence? And all I can point to the Court is that he made this defense basically of mere presence, just hanging around the conspiracy. And in closing argument, counsel tried to rebut the fact that the employment verifications of the gift letters really weren't his. So he laid out the defense, and then in rebuttal, the government made a very good argument that the problem with his argument that he was merely hanging around is that he has a prior conviction for perjury. So whatever chance my client had for acquittal was demolished by that, all stemming from the admission unnecessarily of the perjury conviction. The second issue is the obstruction of justice. And to me, this certainly extends the obstruction of justice enhancement about as far as I've seen it, and for this reason. Almost five years went by between the time of the alleged obstruction, and that was in June of 1996, this phone call, to indictment in March of 2001. And that's the only evidence that the government relied on for the obstruction finding. There was another suggestion that there was some other evidence, but they didn't rely on that. So the only evidence is this one phone call, a scripted call. Mr. De Bruno is now cooperating with the government. You can tell from the conversation that's in the excerpt of record that he's working at the suggestion of the agent. He's saying things like, well, it doesn't disincriminate us. So you have a scripted phone call, not originated by my client. He participates in it. For the most part, this is ambiguous, but, you know, fairly, his fair position is that he suggested lying to the FBI. He had no knowledge prior to this that he's the subject of the investigation. And then there is no ñ nothing else for five years to subject the obstructs justice, and yet he gets the two-point enhancement. That, to me, strikes me as a far-reaching of that. What's the significance of the delay between the conversation and the prosecution? I mean, if he obstructed justice during that telephone call, he did. And so what's the significance of the delay? I think if there was a genuine attempt to obstruct justice, you might have seen some more evidence of it over the next five years, Your Honor. And certainly if you obstructed justice, you did. I'll grant you that. But there's ambiguity in this phone call. It's just this one conversation in which there's a lot of talking that, when you actually read it or listen to the tape, it's not really crystal clear what he's trying to do. He's just being informed, hey, I heard from the FBI. What should I do? Well, you don't really have to talk to them. That's not obstruction of justice. You can certainly say that. The only thing in there is the statement that, well, if you say that you got it from another fellow, you know, I guess it's the ambiguity combined with the length of time is what makes it less likely that it's an obstruction of justice. And those are the only two issues I care to raise to the Court, unless you have some other questions. Thank you. Thank you. All right. Let's hear from the government. Morning, Your Honors. May it please the Court. Brian Hofstadt for the government. With me today is Wes Shue. I will be discussing Defendant Maven first, and Mr. Shue will be discussing Defendant James. I just want to respond briefly to Defendant Maven's arguments. The first regarding the 404B-403 issue. Defendant seems to constitute his argument today on whether or not the district court abused its discretion in admitting the evidence under Rule 403. The government maintains that the district court did not abuse its discretion. In this case, the evidence was clearly probative of not only the fact that Defendant Maven knew it was wrong to be using that alias, because the conviction put him on notice that he should not be using it in a fashion in which he has – in which he used the same alias in this particular charge scheme. Defendant contends on the flip side that the evidence was very prejudicial, both primarily because it was a felony conviction. While the fact that it's a felony conviction does weigh into the prejudice analysis, this Court has held in Otis and other decisions that the fact that a district court admits a prior felony conviction does not itself make it unfairly prejudicial. And in this case, the prejudice was mitigated by the district court's instruction to the jury not once, but twice, that this evidence was to be admitted solely for the purpose of assessing the defendant's intent, knowledge, absence of mistake, and was not to be used to evaluate any sort of propensity. The district court informed the jury of this at the time that the stipulation regarding the conviction was read into the record, and again, during the closing jury instructions. And this Court has held in a long line of cases that we've cited in our briefs that that type of curative instruction cures or mitigates any sort of unfair prejudice that might arise from the admission of such evidence. Briefly touching on the harmfulness argument, the government believes that the admission of this evidence was harmless in any event. And the evidence of the defendant's intent to defraud, which this particular prior conviction was relevant to, was overwhelming in light of the defendant's statements on the tapes, the statements, the testimony of borrower Krista Bruno, who was on the telephone call. Kennedy. It's your bonus argument that it was unnecessary to put it in, I guess. Well, it was, again, it was the only direct evidence. I mean, there was other evidence that Defendant Maben used this particular identity of Roland Lockhart. But this was the only direct evidence, again, that he knew that it was wrong to do so as to this particular aspect of his involvement. Again, he was manufacturing documents for both Bear Stearns and for Braxton Radiology. And on the tapes, on the June 21, 1996 tape, he agreed that he and Codefendant Ockpon and De Bruno all knew they were taking a risk when they went into this. So, again, there's other evidence of the defendant's intent to defraud. But this prior conviction added a piece of it that wasn't there before. And I recognize there is some tension between saying that it's harmless and also cumulative, but I think that, you know, that that same tension is in the defendant's argument as well. The government does not believe that the defendant – I mean, while the defendant argued in closing that he was merely present, the government's response to that in rebuttal was not simply that, well, that's not true because he has this prior conviction. The government's response was the evidence in this case indicated that the defendant was not merely present. He was taking affirmative acts such as manufacturing the documents, such as counseling De Bruno to lie on the telephone call, such as applying for loans in his own alias to indicate that he was not just hanging around a felony, as his attorney indicated. With respect to the obstruction of justice, the district court did not clearly err in this respect either. In fact, the district court noted in its findings that this was a rather crass effort at obstruction. The fact that the defendant only engaged in this obstructive conduct once and did not engage in it again does not in any way mitigate or eliminate the fact that he did, in fact, engage in it on this single occasion. Nor was this conversation scripted by De Bruno, the cooperator. He simply called up and said, what do I tell the FBI? Both Codefendant Ockpon and Defendant Maven could have clearly said, tell them the truth. If they were, in fact, innocent, tell them the truth. We weren't involved. But what they did instead was they counseled him to adhere to a false story and to lie to the FBI. In addition, as part of that phone call, Defendant Maven agreed to remove his name from the answering machine service for Braxton Radiology, one of the false companies that would have led right back to him. So that's another aspect of the obstructive conduct that was discussed during that telephone call. And the government believes that the call was not ambiguous. It was very clear that they were counseling Defendant Maven to adhere to this fake story about a dead man putting together the loan application. And any ambiguity, in any event, was properly resolved by the district court under clear error review. So unless the panel has any questions about any of those issues or about any of the other ones raised by Defendant Maven, I'll now yield the lectern to my colleagues. May it please the Court, West Street v. The United States in the James Appeal. Your Honor, I would like to – Your Honors, I would like to address a few points made by the defense counsel with respect to the abuse of trust enhancement applied to Mr. James. First of all, the government contends, as it set forth in its 28J letter, that Payton does control at least the defendant's main argument on appeal here. The main argument on appeal was that none of the people here ultimately suffered financial loss specifically, or that the government didn't prove that at sentencing and, therefore, the defendant could not have held a position of trust with either the lenders or the borrowers in this case. The Payton case clearly forecloses that argument by stating unequivocally that victims of fraud are not limited to the entities that bear ultimate financial burden, but also include those who bear emotional, financial, and other burdens. There was significant testimony in this case that loan foreclosures, presumably based upon misstatements in the record or in the – or in the application process, would cost lenders money eventually in some form. That comes very early in the trial, and, in fact, it's at page 10 of the government's text of the record, that the lenders themselves would suffer. Whether or not they suffered the ultimate harm, that there was no – there was no discussion of that specifically in the record. The defendant certainly is taking from the fact that they suffered the ultimate harm. The lenders, Your Honor. I'm addressing the lenders first. The lenders, five of whom testified at trial, four of whom testified that they – that they relied on mortgage brokers to submit factually accurate data because the mortgage brokers were in the best position to verify that data, and one, in particular, who testified that it would be almost impossible to – for the lenders to verify the information submitted by mortgage brokers from lenders in the first instance. Now, this is in distinct contrast to the case where a borrower walks into the lender in the first instance. I believe, as Judge Nelson mentioned earlier, there would be less reliance on a borrower who walked in the door to one of these lenders as a retail borrower and presented W-2 information and work information. There was significantly less reliance by the lenders in this case because the mortgage brokers were contractually bound to provide factually correct information, and they were also bound as a matter of convention to double-check that information and to submit factually accurate information. But the fact that they're contractually bound, and even if – the fact that there's reliance doesn't put them in a position of trust, does it? Not alone, Your Honor. But certainly that – that is evidence that demonstrates that the – what – corroborates actually what the lenders said, which was that they could not, based on their position, verify the documents that were – that were forwarded by the mortgage brokers. Would that be the same for a borrower who's not represented by a mortgage broker? The lender takes position, well, I can't verify that? I don't understand that argument. If a lender – well, there was testimony that at least one lender here, America West, also acted as a retail mortgage broker, which means, Your Honor, that you or I could walk in the front door and apply for a loan in bringing with us employment information and items like that. There was testimony from America West that there would be a distinction between that loan that walked in the front door as just a borrower and a loan provided by a mortgage broker. And the lender, as I mentioned, and by contract, was required to provide factually accurate information because the volume that they would be providing – That's no different than the obligation that's on a borrower who's not represented by a mortgage broker. A borrower has the obligation to provide truthful and accurate information. That's the reason borrowers aren't going to have to, you know, that kind of fraud, right? Yes. It can be directly. So that doesn't put a borrower in a position of trust vis-à-vis the lender. No, that's true, Your Honor, but – Then why should the mortgage broker representing the borrower be put in a position of trust as – with relation to the lender? Because the evidence in this case demonstrated that mortgage brokers provide such volume to lenders that it would be impossible for them to give the same level of scrutiny that they would to individual borrowers coming in the door. And it is that relationship that creates the position of trust in this case. The relationship meaning the mere volume. Well, the fact that the volume has allowed as a matter of convention for the mortgage broker position to be created, it created a position or a piece of business, I guess, for lack of a better word, that the lenders could rely upon in order to increase the business, in order to facilitate these loans. And it's that position that's different, admittedly different from the borrower who just walks in the door with his own papers that makes the defendant here, puts him in a position of trust. So I'm trying to understand then your argument is that even though the mortgage broker's position is individual to the lenders because of the collective of the lending institutions deciding that they want to put a volume of loans out that they can't personally investigate on an individualized borrower-lender direct contact, they have created a niche market for mortgage brokers. And therefore, this niche market is in effect under a blanket trust position because but for the lenders tolerating their role, they wouldn't have any business at all. Or they at least certainly wouldn't have the business that they've got. I think that is precisely my argument based on the evidence that's in the record in this case. The only caveat I would give you. Excuse me. Does the person who is now in the position of this special trust position supposed to be aware of that fact? Well, I would say that in this case there was no question that he was aware of that. But that there was a position of trust? Well, that he had what was akin to a fiduciary duty. He was required by contract Exhibit 4. But you keep telling us that the contract doesn't do it. I mean, if I had a contract as a, you know, I had five clients. That was my whole business. I'm a real estate broker, but I also decide as the side. I go off and I, as a courtesy to some friends, have five clients. And I have a contract with Fannie Mae or whoever the country, whoever the lender is, that I'm supposed to now understand that even though that's not normally a trust position, because I'm in an industry that's unique, suddenly that normal contractual relationship has become a position of trust. Is that the thrust of your argument? I don't think the Court we're certainly not asking the Court to decide as a general matter that all mortgage brokers occupy a position of trust in relation to lenders. I'm arguing that the evidence in this case is that the defendants knew that they had to act in good faith with respect to the lenders. They were told that both at the – they were explicitly told that in the contracts that they signed. Right. But why is that different from a normal mortgage broker relationship? In other words, what makes this suddenly a contract that's not, doesn't, isn't? Assuming a contract to act in good faith doesn't normally create a fiduciary trust relationship, what converts it in this case? The fact that there were so many in the industry that the lenders, as a practical matter, had to rely on it and in so doing created this niche market? Well, I think that's right, Your Honor. And I think that – I think I would take that position as far as notice as to whether or not the defendants or any mortgage broker should know whether or not they were in that position of trust. Certainly, by them doing – by – certainly the defendants in this case did such a volume that they knew that the lenders were not going to be able to verify all the information that they were providing. That was the entire basis of the fraud. But the – to the extent that there's evidence in the record of how mortgage brokers practiced in general, they would certainly know from practice how many loans that they were submitting to the lenders. I'd also like to touch on, Your Honor, in the remaining time, the abuse of trust with respect to the borrowers, unless the Court has further questions on the lender aspect. The fiduciary duty to the borrowers is established both in – at least in California, both statutorily and from principles of agency. The – even the defendant here on appeal admits that there was some position of trust with respect to Pamela Jackson. Just taking this – just taking this borrower, excuse me, there was sufficient evidence in the record for the district court to find that there was an abusive position of trust here. Defendant James did directly deal with Pamela Jackson as a borrower. She not only applied for a primary loan on the Northridge property, she also applied for the home improvement loan, which Defendant James also served as broker for. The evidence in this case showed that $1,000 from that home improvement loan went directly to Defendant James. This is trial Exhibit 112. As soon as the – as soon as the home improvement loan cleared, that $1,000 was $1,000 that Pamela Jackson lost because, as the evidence showed, the lender, David Miller, was not a borrower. And the defendant, in fact, in the case of the $1,000 loan, testified that he specifically informed Defendant James and Defendant Ockpon of the HUD requirement that all the funds be used to improve the homes, that no commissions could be taken on home improvement  And Defendant James did, in fact, take a $1,000 commission in that case with respect to that loan. That, in and of itself, is sufficient to demonstrate that the defendant abused a position of trust with respect to that borrower. With respect to whether or not the borrowers that the defendant dealt with or had responsibility for not suffering any financial loss, that is also belied by the record. The borrower, Kibiney, who by the time of trial had the name of Ockpon, when she was testified, she testified that she dealt directly with Defendant Usanga and that the two men in the cubicles, the only two people with offices in countywide, supervised him. That very borrower testified that the property on which she had applied was foreclosed upon. That testimony is at the government excerpts of Record 50 to 51. That foreclosure affected her credit history. Although she didn't specifically testify how it affected her credit history, certainly there was evidence in the record from the Whitmore foreclosure that foreclosures generally have adverse effects on credit history. And so with respect to that borrower also, who the government contends that Defendant James is responsible for, and in fact, he was the real estate broker certainly on that, and he did sign the mortgage application as the interviewer, the government would suggest that in that loan as well there was sufficient evidence for the district court to find that Defendant James had abused his position of trust. Unless the court has any further questions, the government will submit. Just one question on the relationship between the lender and the broker. Some of these borrowers were totally fictional, weren't they? That's correct. So wouldn't Mr. James have to assume that the lender trusted him enough not to check that borrower in order to proceed with the fraud? Absolutely, Your Honor. So he himself was relying on the fact that they trusted him. That's correct, Your Honor. Okay. All right. Thank you. Rebuttal. Just first on the question of the relationship between Mr. James and the initial lenders, the fact of a contract and the fact of volume cannot create a position of trust. The relationship between Mr. James and the lenders has the hallmarks of an ordinary commercial relationship. And there is trust between most commercial parties. Most contracts involve an amount of trust. But that does not elevate the relationship into one that is a fiduciary or one that has the hallmarks of a fiduciary position, which is what's required for this adjustment. I did want to address one brief point. To the extent that the government relies on the Kibiney Ocon loan, the evidence was overwhelming that that borrower was a participant in the fraud. She was not a victim and can't be considered a victim in that sense. She – the evidence was that she and Mr. Usanga came up with a plan for her to, quote, unquote, buy a property. She netted $9,000, which she spent. And I believe the evidence showed that she visited the property. She didn't want to live there. She collected the rent and she never made any mortgage payments. So she can't constitute the basis for the abuse of trust issue. With that, I'm willing to submit. All right. Mr. Young, do you want any rebuttal? Submitted, Your Honor. All right. Then this case is submitted for decision. We thank all counsel for your argument. That concludes the – today's calendar, so the panel will now stand in recess. All rise. Cheers. Nice to meet you. Nice to meet you. Nice to meet you. Nice to meet you.
judges: T.G. Nelson, Tashima, Fisher